James A. BRINTON, Plaintiff and Appellant,

v.

IHC HOSPITALS, INC., a Utah corporation; John Doe I and John Doe II, Defendants and Appellees.

No. 950256.

Supreme Court of Utah.

Dec. 29, 1998.

Rehearing Denied March 1, 1999.

Kevin Egan Anderson, Robert S. Campbell, Joann Shields, Salt Lake City for Brinton.

James W. Gilson, R. Stephen Marshall, Scott C. Pugsley, David L. Arrington, Craig W. Dallon, Salt Lake City, for IHC Hospitals.

STEWART, Justice:

Plaintiff James A. Brinton appeals the district court's grant of summary judgment in favor of defendant IHC Hospitals, Inc. ("IHC"). Dr. Brinton was a staff member at two IHC hospitals in Utah County for several years. IHC imposed multiple practice restrictions on him and then revoked his hospital privileges. Dr. Brinton then filed suit against IHC in district court.

In the district court, Dr. Brinton asserted nine causes of action, accompanied by demands for compensatory and punitive damages.[1] He also asserted three claims for injunctive or declaratory relief, demanding reinstatement. The trial court decided that each of his claims was ultimately grounded in the assertion that IHC had violated the contractual bylaws governing Dr. Brinton's staff privileges. On cross-motions for summary judgment, the district court ruled in IHC's favor. The court held that Dr. Brinton had waived most of his assertions of contractual violations of the bylaws, and for those claims not waived, that IHC had substantially complied with its bylaws. The district court ruled that none of Dr. Brinton's claims for relief could stand without a showing of substantial violation of the bylaws and dismissed his claims. We affirm.

## I. BACKGROUND

Dr. Brinton worked at both Utah Valley Regional Medical Center and Orem Valley Hospital (collectively "the Hospital"). IHC operates both facilities under a unified administrative structure. As a condition to obtaining staff privileges, Dr. Brinton agreed to be bound by Hospital Bylaws (the "Bylaws"). The Bylaws incorporated another document known as the Fair Hearing Plan ("FHP"), which dictates specific procedures for conducting peer review of physicians on staff at the Hospital.

The Hospital's administration is divided into nineteen staff departments. Dr. Brinton belonged to the obstetrics and gynecology ("OB–GYN") department. The basic administrative units concerned with disciplinary actions against physicians with staff privileges at the Hospital are the Medical Executive Committee (the "MEC") and the Governing Board (the "Board").

The MEC is composed of the heads of each department. If a serious quality assurance concern arises, the relevant department head generally reports that concern to the President's Committee of the MEC. The President's Committee serves a filtering function to avoid the unwarranted spread of negative information about a physician. The Committee then determines whether the problem should be reported to the MEC. If the problem is reported, the MEC votes for appropriate action and may recommend restrictions or revocation of hospital privileges to the Governing Board.

The Board is composed of both lay people and persons with medical training and is analogous to a corporate board of directors. It is ultimately responsible for the admission and retention of physicians practicing at the Hospital. The Board has an "Executive Committee" that serves a filtering purpose

---

1. The causes of action asserted were (1) violation of state antitrust law, (2) breach of contract, (3) breach of covenant of cooperation, (4) promissory estoppel, (5) tortious interference with economic relations, (6) defamation, (7) business disparagement, (8) fraud, and (9) duress.

somewhat analogous to the President's Committee of the MEC. This Executive Committee reviews in detail allegations of substandard care or misconduct and then presents a summary to the Board.

Dr. Brinton, who began working at the Hospital in 1978, had a very busy practice. By 1989, he delivered an average of 45 babies per month, and on occasion delivered as many as 60. Other OB–GYN physicians averaged 24 deliveries per month, and there were very few who routinely performed more than 30 per month. Dr. Brinton performed gynecological procedures as well, but his practice focused on obstetrics.

Friction arose between Dr. Brinton and other members of the OB–GYN staff during the first ten years he was on staff. Some physicians in the OB–GYN department complained that Dr. Brinton treated too many patients, provided substandard care, and took other inappropriate actions with respect to staff and patients.

## A. Hearings in the Spring of 1989 and Terms of Probation

In 1988, some of Dr. Brinton's hysterectomy patients suffered complications. These incidents triggered the first round of restrictions on Dr. Brinton's privileges. In December 1988, the chairman of the OB–GYN Department suspended Dr. Brinton's rights to perform hysterectomies of the type in which the complications had arisen. The Hospital also imposed proctoring requirements to ensure Dr. Brinton became qualified to perform the procedure.

The head of the OB–GYN department subsequently accused Dr. Brinton of failing to complete his proctoring requirements and lying about his noncompliance when confronted. On February 13, 1989, the MEC summarily suspended Dr. Brinton from performing all but a small number of gynecological surgeries, and the Board subsequently ratified that action on February 22, 1989. In March 1989, responding to the recommendations of a hearing committee convened by the Board, the Board continued Dr. Brinton's suspension, under modified terms, for a period of two months. The Board also imposed a three-month probation upon Dr.

Brinton, scheduled to commence after his suspension expired.

On March 20, 1989, a baby died, allegedly due to Dr. Brinton's failure to diagnose gestational diabetes. The Hospital summarily suspended all of Dr. Brinton's privileges effective April 7, 1989, and the MEC recommended that the Hospital revoke those privileges. The Board convened a series of hearings to address Dr. Brinton's status at the Hospital. Those hearings were held on April 26th, May 15th, and June 2nd. The Hospital addressed both a comprehensive list of recent allegations of standard of care problems, as well as other prior complaints.

Minutes taken at the hearings indicate that the Board seriously considered revoking Dr. Brinton's privileges. Dr. Brinton conceded that he had treated too many patients and was not able to devote enough time to each patient and remain abreast of current medical knowledge. Some OB–GYN colleagues felt that Dr. Brinton's problems were largely irremediable because he exercised a lack of judgment and lacked medical knowledge. Other persons, including Dr. Brinton, believed his difficulties were primarily a consequence of his immense caseload. A majority of Board members believed Dr. Brinton could rehabilitate himself if he reduced his caseload and took specific steps to improve his medical knowledge in areas where the Hospital had adjudged him deficient.

The Board ultimately decided to give Dr. Brinton a "second chance," releasing him from his suspension, and again imposed probation. Among other conditions, the terms of this probation limited Dr. Brinton to 25 deliveries per month and required him to respond immediately whenever nurses requested that he come to the Hospital. The Hospital also retained an independent physician, Dr. Reed Heywood, to provide an independent review of Dr. Brinton's case files. Although Dr. Brinton did not agree with the harshness of some of the criticism leveled against him, he admitted he had made mistakes and his caseload was creating problems. On June 2, 1989, Dr. Brinton willingly signed a document entitled "Terms of Probation" and expressed optimism that he could

fulfill his probation and rehabilitate himself in the eyes of the Board. By the terms of this document, Dr. Brinton's probation was to last for at least two years.

## B. Amended Terms of Probation

In August 1989, the Hospital accused Dr. Brinton of failing to abide by the Terms of Probation, and the Board summarily suspended him. Dr. Brinton retained an attorney, who requested an expedited hearing. The Hospital convened an independent hearing panel, which met on September 5, 1989. The Hospital accused Dr. Brinton of failing to adequately reduce his caseload in the first two months of probation and alleged substandard care. The hearing panel, however, found Dr. Brinton had not had enough time to comply with the patient reduction requirement. The panel recommended against revocation of privileges, and the Board reinstated Dr. Brinton's privileges subject to a document entitled "Amended Terms of Probation," which Dr. Brinton signed on September 26, 1989. This probationary period was also scheduled to last for a period of at least two years, commencing on September 22, 1989.

## C. Second Amended Terms of Probation

On November 14, 1990, the Board resolved to have the MEC review Dr. Brinton's probation and performance after determining that he had "exhibited continuing serious problems." On November 27, 1990, the MEC determined that Dr. Brinton had provided substandard care in several cases in violation of the Amended Terms of Probation. Acting upon the recommendation of the MEC and other reports, the Board proposed revocation of Dr. Brinton's privileges on December 5.[2] At Dr. Brinton's request, an independent hearing panel convened March 20 and 21, 1991. Dr. Robert Romney, the Hospital's medical director, took primary responsibility for presenting three cases for the panel's review. The panel found that these cases were not significant enough to constitute a violation of the Amended Terms of Probation. The panel stated that, although Dr. Brinton had significantly improved his practice patterns, he appeared to retain some problems in certain types of cases, such as diagnosing twins. The panel stated:

> Whether [Dr. Brinton] has met [the] standard [of care for OB–GYNs] or not during his probation is problematic. The Hospital did not prove that his care was substandard since the inception of the revised probation. The information presented, however, does raise questions as to the quality of care provided patients by Dr. Brinton.

The panel also found that the Board had failed to address all pertinent evidence before recommending revocation of Dr. Brinton's privileges. In particular, Dr. Romney failed to present a report from Dr. Heywood, the independent physician retained to review Dr. Brinton's charts.[3] Ultimately, the panel recommended continuation of probation under clarified terms.

The Board reviewed the panel's report on April 11, 1991, and voted to rescind its earlier determination to revoke Dr. Brinton's privileges. The Hospital prepared a document entitled "Second Amended Terms of Proba-

2. This meeting may have actually occurred on December 4, according to a letter subsequently sent to Dr. Brinton by Merrill Gappmayer, Chairman of the Board, describing the events of this meeting as they pertained to Dr. Brinton's status at IHC.

3. The Hospital had also replaced Dr. Heywood with another physician. The panel questioned the "objectivity of the hospital and its representatives in making a recommendation to revoke Dr. Brinton's privileges on the basis of these three cases." It noted that Dr. Heywood's report—which was generally favorable to Dr. Brinton—was "apparently suppressed" when information concerning Dr. Brinton had been forwarded to the Board for its recommendation. The panel

expressed doubt that the Board would have recommended revocation if it had reviewed the report. Dr. Romney stated at the March 1991 hearing that he had become concerned about the "political" tone of Dr. Heywood's report (referring to an apparently acrimonious personality conflict between Dr. Heywood and a prominent member of the Hospital's staff). This perception of conflict was the stated reason for Dr. Romney's decision to replace Dr. Heywood as Dr. Brinton's outside reviewer. It is notable, however, that the replacement doctor, Dr. Larkin, had no reason to be biased against Dr. Brinton. Indeed, Dr. Larkin expressed some discomfort in reviewing the files because he considered Dr. Brinton a personal friend.

tion" and sent it to Dr. Brinton. After negotiations with Dr. Brinton and his attorney, the Board approved a few proposed modifications, and Dr. Brinton signed the modified Second Amended Terms of Probation on August 6, 1991. These terms were substantially similar to those in the Amended Terms of Probation, but extended Dr. Brinton's probation for at least an additional two years, commencing April 15, 1991. The terms did include a clause that allowed the Hospital to present prior allegations of standard of care violations in any future hearings.[4] The terms also provided for intensive review of Dr. Brinton's cases, prescribing immediate summary suspension and allowing for initiation of proceedings to revoke Dr. Brinton's medical staff privileges if the executive committee of the Board found any future violation of the terms.[5]

### D. Review of Alleged Violations of the Second Amended Terms of Probation

In the summer of 1992, Dr. Romney presented allegations of substandard care in five cases involving Dr. Brinton's patients. The Board voted to summarily suspend Dr. Brinton's privileges and initiated proceedings to revoke his staff membership. Another hearing panel was convened. Under the Bylaws' FHP provisions, the burden of proof was upon Dr. Brinton to demonstrate that the Board's adverse action lacked "any factual basis" or was "arbitrary, unreasonable or capricious."[6]

In addition to the five cases that prompted the latest action against Dr. Brinton, IHC presented earlier cases that had been addressed by previous hearing panels. Dr. Romney testified on behalf of the Hospital and presented the Hospital's evidence of substandard care. Dr. Brinton retained another physician, Dr. DeVore, to review the cases presented to the hearing panel. Dr. DeVore found no violation of the standard of care in any of the cases presented. Though Dr. Brinton has claimed that the Hospital refused to provide him with comparative statistical data and instructed IHC staff not to speak with him, he nevertheless was able to call numerous witnesses in his defense—including one member of a prior hearing panel—who criticized the Hospital's treatment of him.[7]

The hearing panel concluded that, in the context of Dr. Brinton's background, the Hospital's decision to terminate Dr. Brinton's privileges was justified. The panel found "there were substantial breaches of the terms of probation and of the standard of care in some of the [five] cases presented." Of those cases, the panel found that two evidenced a significant breach of the minimal standard of care. The panel found that the other three cases did not involve breaches of the standard of care, but one of them did involve a violation of the terms of probation

---

**4.** Paragraph 5 provided for review of "not only new cases, but all previous cases involving violations of the terms of probation and standards of good medical practice commencing on January 1, 1987, and continuing to the present."

**5.** Dr. Brinton was reluctant to sign the Second Amended Terms of Probation. Because continuation of his staff privileges was contingent upon agreeing to the terms, he was presented with a choice of signing them, appealing to the Board, or taking the matter to litigation. He chose to sign the terms and to abide by them.

**6.** The pertinent text of FHP § 4.60 read as follows: "The practitioner who requested the hearing shall have the burden of proving that the adverse recommendations or action lacks any factual basis, or that such basis or the conclusions drawn therefrom are either arbitrary, unreasonable or capricious."

**7.** The panel criticized the objectivity of both Dr. Brinton's and the Hospital's witnesses. Commenting on the testimony presented by each side, the panel observed that "Dr. DeVore's testimony revealed that he was trying his very best to support Dr. Brinton even to the point of selectively presenting his opinion as an expert. The panel would have appreciated a more objective presentation." The panel also criticized the Hospital's presentation, noting that "Dr. Romney's testimony on occasion seemed to have a point of view as opposed to an objective presentation for the benefit of the Panel." The panel further recommended that

> if there are further hearings at which issues of the standard of care are raised, the Medical Center should endeavor to present testimony from specialists and experts who are currently practicing. The Panel was concerned that Dr. Romney, while a recognized authority in the past, was not presently practicing and had not been for a significant time.

because Dr. Brinton had failed to consult with another doctor on a high risk delivery, as required by the Second Amended Terms of Probation. The panel stated:

> Dr. Brinton continues to repeat past practices which got him in trouble earlier in his history at the Hospital. He seems unable to meet current standards of this Hospital and does not demonstrate that he is currently competent to perform obstetrics and gynecology at the level expected of physicians who practice on this staff nor to exercise the appropriate judgments that are necessary to the maintenance of a practice in light of the current standard of care.

In a letter dated December 16, 1992, the Board notified Dr. Brinton of the panel's decision supporting the Board's earlier determination to terminate his privileges. Although FHP § 5.20 technically required the Board to formally affirm, modify, or reject the panel's findings,[8] the Board simply forwarded notification of the panel's results to Dr. Brinton and informed him that he had a right to appeal those results. The Board presumably believed a formal vote to affirm the panel's findings would have been redundant. Dr. Brinton appealed to the Board.

The Board met as an appellate panel in February 1993. Section 7.70 of the FHP provides that deliberations at the close of the appellate hearing shall take place "outside the presence of the parties."[9] Three persons who Dr. Brinton now asserts were "unauthorized" persons remained during deliberations: James Gilson, the Board's in-house counsel, Larry Dursteler, a hospital administrator, and Merlene Southwell, an IHC employee in charge of risk management. The

Board reaffirmed the determination to revoke Dr. Brinton's privileges.

*E. Proceedings Before the District Court*

In the district court, Dr. Brinton alleged nine causes of action and three claims for injunctive or declaratory relief. Both IHC and Dr. Brinton agreed that the Bylaws, which included the FHP, constituted a contract governing Dr. Brinton's privileges. The fundamental basis for Dr. Brinton's claims was that IHC had violated his contractual fair process rights as outlined in the Bylaws and the FHP.

IHC filed a motion for summary judgment, and Dr. Brinton filed a cross-motion for partial summary judgment. The district court granted summary judgment in favor of IHC, with one minor exception, and denied Dr. Brinton's motion for partial summary judgment. The district court found that there remained a disputed issue of material fact as to Dr. Brinton's claim that the Hospital had, in an isolated incident, altered 11 sets of Board meeting minutes with fraudulent intent. However, in its order denying Dr. Brinton's motion to reconsider, the court determined that the "alleged fraudulent alteration of Board minutes rais[ed] no justiciable cause of action."

In an order dated May 10, 1995, the court held that all of Dr. Brinton's claims depended upon his ability to show that the Hospital had violated its contractual fair process obligations.[10] The court held that the only claims not waived, other than those issues Dr. Brinton did timely raise in the February 1993 appellate hearing before the Board, were (1) his contentions that the February 1993 appellate review violated the Bylaws by

---

**8.** FHP § 5.20 provided:
Within ten days after receipt of the record of the hearing committee, the Medical Executive Committee or the Board, as the case may be, shall consider the same and affirm, modify or reverse its recommendation or action in the matter. It shall transmit the result together with the hearing record, the report of the hearing committee and all other documentation considered, to the Medical Director.

**9.** FHP § 7.70 stated in pertinent part:
Upon the conclusion of oral statements, if allowed, the appellate review shall be closed.

The appellate review body shall thereupon, at a time convenient to itself, conduct its deliberations outside the presence of the parties. Upon the conclusion of those deliberations, the appellate review shall be declared finally adjourned.

**10.** The court issued a separate written ruling on February 27, 1995, prior to issuing its final order on the motion to reconsider. It was in the February 27th ruling that the court briefly treated its reasons for dismissing each of the claims raised in Dr. Brinton's complaint.

allowing ex parte contacts with IHC personnel and by allowing unauthorized persons to remain present during the review deliberation, and (2) his argument that the Second Amended Terms of Probation were void from the outset because the Board had not properly approved them. The court held that neither allegation constituted a failure to substantially comply with the Bylaws and that Dr. Brinton had not shown prejudice creating a material issue of disputed fact. The district court also held that IHC was immune from civil liability pursuant to its own Bylaws, the Utah Medical Practice Act, Utah Code Ann. § 58–12–43(7) (Supp.1993), and the Federal Health Care Quality Improvement Act ("HCQIA"), 42 U.S.C. §§ 11101–52.

## II. SCOPE OF APPEAL AND GOVERNING LAW

■ On review of summary judgment, we give no deference to the trial court's conclusions but review them for correctness. *See Hansen v. Mountain Fuel Supply Co.*, 858 P.2d 970, 972 (Utah 1993).

■ Dr. Brinton now makes only a cursory attempt to argue that certain of his tort claims and his antitrust claim can survive without a finding of a material violation of his contract with the Hospital. He has failed to brief any substantial arguments and offers no citations to support his assertions that his non-contract claims are independently supportable without a demonstrated violation of his contract with IHC. Therefore, we do not address them. *See Walker v. U.S. Gen., Inc.*, 916 P.2d 903, 908 (Utah 1996) (declining to address argument alleging fraud because improperly briefed by appellant).

■ In applying contractual fair process provisions such as in this case, courts have made clear that hospitals are entitled to exercise good faith medical judgment, which courts should not lightly question in subsequent civil suits. It is procedural fairness, based on a substantial compliance standard, that is at the heart of a review proceeding such as this. Substantively, we give great deference to a hospital's decision to decide whether medical standards of practice have been met.

> [T]he decision of a private hospital to revoke, suspend, restrict ... [the] clinical privileges of a medical staff member is subject to limited judicial review to ensure that there was substantial compliance with the hospital's medical staff bylaws ... as well as to ensure that the ... bylaws afford basic notice and fair hearing procedures, including an impartial tribunal.

*Mahmoodian v. United Hosp. Ctr. Inc.*, 185 W.Va. 59, 404 S.E.2d 750, 755 (1991); *see also Wong v. Garden Park Community Hosp.*, 565 So.2d 550, 552 (Miss.1990). It follows that courts should not substitute their judgment on medical issues "for the professional judgment of medical and hospital officials with superior qualifications to make such decisions." *Mahmoodian*, 404 S.E.2d at 756; *see also Owens v. New Britain Gen. Hosp.*, 229 Conn. 592, 643 A.2d 233, 241 (1994); *Ritter v. Board of Comm'rs of Adams County Pub. Hosp.*, 96 Wash.2d 503, 637 P.2d 940, 947–48 (1981). In other words, the Bylaws provided Dr. Brinton with a contractual right to a fair process. They did not, however, entitle him to question the good faith medical judgment of the Hospital. Hence, factual disputes about medical judgment cannot constitute a basis for an allegation of breach of contract.

■ Our review is limited to the narrow question of whether there are genuine issues of disputed material fact regarding whether the Hospital provided fair peer review procedures. We decide this issue on the standard of whether the Hospital substantially complied with the IHC Bylaws.[11] This standard

---

11. Dr. Brinton offers no citations that contest this standard in the context of hospital peer review. He refers only to the federal HCQIA, asserting that compliance under that Act is governed by a strict compliance standard. The HCQIA is primarily intended to assure persons that they will be immune from civil liability for good faith participation in peer review if that review meets certain conditions. The HCQIA does not provide a substantive cause of action; nor is it applicable to injunctive or declaratory relief. The conditions for gaining immunity are found at 42 U.S.C. § 11112(a):

> For purposes of the protection set forth in ... this title, a professional review action must be taken—

has been well-established by the majority of states addressing the question. *See Owens*, 643 A.2d at 242 & n. 28; *see also Houston v. Intermountain Health Care, Inc.*, 933 P.2d 403, 408 (Utah Ct.App.1997); *Stiller v. La Porte Hosp., Inc.*, 570 N.E.2d 99, 106 (Ind.Ct. App.1991); *Mahmoodian*, 404 S.E.2d at 755; *Wong*, 565 So.2d at 552 (issue governed by statute). Under this standard, mere technical violations of procedures or policies in administering peer review will not give rise to a cause of action.

■ Also central to the ruling of the issues presented in this case is IHC's and Dr. Brinton's reliance on different standards with respect to whether he waived his right to object to violations of the Bylaws. Dr. Brinton relies on *Rees v. Intermountain Health Care, Inc.*, 808 P.2d 1069 (Utah 1991), arguing that *Rees* requires that IHC show that Dr. Brinton *both knew of* and *distinctly intended* to relinquish his contractual due process rights. He cites *Rees* for the proposition that "silence, or failure to object, is not waiver." However, *Rees* made clear that " '[m]ere silence is not a waiver *unless there is some duty or obligation to speak.*' " *Id.* at 1073 (emphasis added) (quoting *Plateau Mining Co. v. Utah Div. of State Lands*, 802 P.2d 720, 730 (Utah 1990)).

Dr. Brinton ignores a critical fact in *Rees* that clearly distinguishes it from this case. Unlike *Rees*, the Bylaws in this case contain an express waiver provision that required Dr. Brinton to take affirmative steps to raise issues in a timely fashion. Section 9.30 of IHC's FHP provided:

> If at any time after receipt of special notice of an adverse recommendation, action or result, a practitioner fails to make a required request or appearance or otherwise fails to comply with this Fair Hearing

> (1) in the reasonable belief that the action was in the furtherance of quality health care, .
> (2) after a reasonable effort to obtain the facts of the matter,
> (3) after adequate notice and hearing procedures are afforded to the physician involved or after such other procedures as are fair to the physician under the circumstances, and
> (4) in the reasonable belief that the action was warranted by the facts known after such reasonable effort to obtain facts and after meeting the requirement of paragraph (3).

Plan, he shall be deemed to have consented to such adverse recommendation, action or result and to have voluntarily waived all rights to which he might otherwise have been entitled under the Medical Staff Bylaws, then in effect, or this Fair Hearing Plan, with respect to an adverse recommendation or action.

In addition, section 7.20 requires a physician to submit a written statement on appeal "detailing the findings of fact, conclusions and procedural matters with which he disagrees." Thus, during the disciplinary proceedings, Dr. Brinton had to raise all issues of noncompliance with IHC's Bylaws, of which he knew or should have known, in order to now claim that those disciplinary procedures were unlawful. *See Plateau Mining Co.*, 802 P.2d at 730. In *Rees*, the physician was under no such comparable duty. *Rees* expressly noted: "When it became obvious to Dr. Rees that he was not going to be able to negotiate his continued elective cardiac surgery privileges, *he was under no duty to object or argue* with the administrative personnel who were limiting his privileges." *Rees*, 808 P.2d at 1075 (emphasis added).

The waiver analysis in *Rees* does not therefore control in this case, because Dr. Brinton was contractually bound to raise any objections during the process or relinquish them as waived. *See also Soter's v. Deseret Fed. Sav. & Loan*, 857 P.2d 935, 940 (Utah 1993) (reiterating the "general principle in our case law" that " 'mere silence is ordinarily not a waiver, *unless there is some duty or obligation to speak*' " (quoting *Plateau Mining Co.*, 802 P.2d at 730)). In sum, it is clear that Dr. Brinton was "afford[ed] basic notice and fair hearing procedures, including an impartial tribunal," and otherwise fair procedures.[12] *Mahmoodian*, 404 S.E.2d at 755.

Because we do not decide this case based on HCQIA immunity, we need not address Dr. Brinton's arguments with regards to the appropriate standard for reviewing immunity.

12. Dr. Brinton does not argue that the peer review process governed by the FHP failed to provide adequate notice and fair hearing procedures. Dr. Brinton does allege partiality on the part of some participants in the peer review process. We treat this claim in section III.H., below.

■ Under the circumstances of this case, the trial court correctly required Dr. Brinton to timely assert each objection to purported procedural violations of the FHP, in compliance with his contractually assumed duty, or relinquish them. The waiver requirements of the Bylaws perform the same essential function as common law waiver doctrines: the prevention of unfair surprise and the conservation of administrative and judicial resources. During the course of extended administrative review proceedings, the parties' expectations and actions are defined by decisions that accrue during the process. The process is undermined if one party simply saves up a list of grievances and then raises them after the ultimate outcome is not to that party's satisfaction. *See Rogers v. Columbia/HCA of Cent. La., Inc.,* 971 F.Supp. 229, 235 n. 3 (W.D.La.1997); *Kennedy v. St. Joseph Mem'l Hosp.,* 482 N.E.2d 268, 275 (Ind.Ct.App.1985).[13]

■ In this case, IHC justifiably placed its reliance upon the reasonable presumption that Dr. Brinton would exercise diligence and good faith in complying with the fair hearing provisions of the agreement he signed: namely, that he would raise objections during the course of the FHP proceedings designed especially to afford Dr. Brinton and other physicians opportunities to do so.[14] Dr. Brinton cannot now complain of procedural violations which he failed to bring to the attention of the Board during the numerous hearings held on his behalf.

## III. DR. BRINTON'S ALLEGATIONS THAT IHC VIOLATED HIS CONTRACTUAL FAIR PROCESS RIGHTS

Dr. Brinton alleged numerous violations of the Bylaws and the FHP in his complaint. The district court ruled that, as a matter of law, Dr. Brinton waived the majority of his procedural allegations by failing to bring them to the attention of the Hospital during his peer review proceedings. The district court then treated the issues it determined Dr. Brinton had preserved during peer review and ruled that IHC had substantially complied with its contractual obligations under the Bylaws. Dr. Brinton contests the district court's waiver and substantial compliance rulings and argues that several disputed issues of material fact exist. We address those issues in the chronological order in which they arose during the Hospital peer review proceedings.

### A. Hearings in the Spring of 1989

The three hearings that occurred in the spring of 1989 followed informal and somewhat ad hoc procedures.[15] Dr. Brinton readily admitted that his large caseload had caused problems with his ability to adequately care for patients.[16] At no time did he

---

**13.** IHC also argues that it and all persons who participated in the peer review process are immune from suit under IHC Bylaws and that the Utah Medical Malpractice Act (passed in 1996) bars any judicial review of hospital peer review proceedings. Further, the district court held IHC immune from civil liability pursuant to the HCQIA, 42 U.S.C. §§ 11101–52. Because we find the substantial compliance and waiver arguments dispositive, we do not address the immunity arguments.

**14.** IHC impliedly argues that Dr. Brinton should be held to a very strict standard, yet maintains that it should be excused from its own technical deficiencies. We refuse to apply the contract in such an inequitable manner. So long as Dr. Brinton raised concerns in a manner that reasonably placed the Hospital on notice and allowed an opportunity to respond without substantially prejudicing its interests, he should be excused from hyper-technical compliance with the Bylaws to the same extent the Hospital is likewise excused.

**15.** Neither party has provided a full copy of the 1989 version of the Bylaws in their briefs to this Court. The Bylaws and the FHP were apparently amended in 1990 to more closely conform with the federal HCQIA, and the 1990 version governed the bulk of the proceedings against Dr. Brinton.

**16.** Dr. Brinton now characterizes his conciliatory and apologetic statements as an attempt to generate sympathy with the Board rather than a genuine admission of fault. However, some two years after the spring 1989 hearings, he still conceded that, prior to those hearings,

> I was not practicing as good a medicine as I was capable of practicing. I admit that because I was so busy, and I've admitted to committees just like this, that I was not keeping as current as I should have been. It was very difficult for me to—you know, these numbers are easy to throw around, but if you deliver 550 babies a year, you're not doing a lot of other things.

object to the procedures employed. The trial court ruled that Dr. Brinton waived any objection to the spring 1989 series of hearings.

■ Dr. Brinton argues that the Hospital's actions in placing him on summary suspension during the three hearings constituted duress that prevented him from raising issues of procedural irregularity. The record does not support his assertion of duress. Both Dr. Brinton and IHC rely on *Andreini v. Hultgren*, 860 P.2d 916, 921–22 (Utah 1993), a medical malpractice case. *Andreini* noted that duress necessarily involves an "improper threat." *Id.* at 921. Although Dr. Brinton was faced with the unpalatable choice of signing the first Terms of Probation on June 2, 1989, or remaining on suspension pending appeal, he has not articulated how this circumstance constituted an *improper* threat. The Hospital was entitled to summarily suspend Dr. Brinton if it believed suspension was necessary to protect the patients under his care.[17] Hence, the impact of suspension, although it clearly presented Dr. Brinton with a significant incentive to reach a quick agreement with the Hospital, could not reasonably be construed as an improper action constituting duress. The trial court correctly ruled that Dr. Brinton waived his claims that IHC violated the Bylaws during the spring 1989 hearings.

### B. Alleged Violation of the First Terms of Probation

After the early 1989 hearings, the Board imposed the first "Terms of Probation." The Hospital accused Dr. Brinton of violating those terms in August of 1989 and summarily suspended his privileges. The Board also proposed revocation of those privileges. The primary accusation was that Dr. Brinton had not reduced his patient caseload to the level required by the Terms of Probation. An independent hearing panel convened on September 5, 1989. The panel rejected the Board's proposed revocation of privileges and recommended continuation of the probationary terms. The terms of probation were then clarified in a document entitled "Amended Terms of Probation," and the two-year probationary period was continued with a new starting date of September 22, 1989. Dr. Brinton has failed to raise any substantial claims on appeal relating to this period of time, and has not articulated any prejudice resulting from the panel's refusal to endorse the Board's proposed action or the subsequent imposition of the Amended Terms of Probation.

### C. Alleged Violation of the Amended Terms of Probation and the March 1991 Hearing Panel

■ Dr. Brinton was accused of rendering substandard care in several cases in late 1990. On November 27, 1990, complying with the Board's request that it consider whether Dr. Brinton had violated the Amended Terms of Probation, the MEC determined that Dr. Brinton had in fact violated his probation. On December 6, 1990, based on the MEC finding, the Board proposed revocation of Dr. Brinton's privileges

---

17. Dr. Brinton has not provided a copy of, or a record citation to, the provision of the pre–1990 Bylaws relating to summary suspension. Nor has IHC provided this information. We therefore can only presume that it was similar to the provision of the Bylaws that was adopted in 1990 and that governed from that time forward. The 1990 Bylaws section dealing with summary suspension clearly envisions immediate suspension in circumstances where quality of care issues may implicate the safety of patients. Section 7.06 of the Bylaws allows for summary suspension "[w]henever a practitioner's conduct requires immediate action to protect the patient or those involved with his care." Clearly, the Hospital was entitled to employ summary suspension as a means of protecting patients while allegations of substandard care were investigated. On approximately March 20, 1989, a baby died, possibly as a result of Dr. Brinton's failure to diagnose gestational diabetes. This incident, in conjunction with a number of other prior complaints about Dr. Brinton's practice, had raised the question of whether Dr. Brinton was endangering his patients and whether he should be allowed to retain his privileges. Indeed, the minutes of the Board meetings and hearings during April and May of 1989 indicate that the Board was on the verge of revoking Dr. Brinton's privileges because of the dangers posed. It is clear that, under the Bylaws, the Hospital was allowed to employ summary suspension as an emergency measure in such circumstances. Moreover, Dr. Brinton has shown no record evidence that he timely notified the Hospital that he believed the manner in which summary suspension had been imposed violated the Bylaws.

and informed him of his right to a hearing. Dr. Brinton now asserts that he was entitled to a fair hearing at a different stage of the proceedings than it was granted. Specifically, Dr. Brinton claims that it was the MEC that originated the "adverse action," and that he was therefore entitled to a hearing on the MEC's decision pursuant to FHP §§ 2.20 and 2.30.[18] He argues that the district court's ruling that he waived this claim is legally insupportable because IHC actively concealed the MEC's actions, thus preventing him from timely objecting.[19]

The district court held, and the record indicates, that Dr. Brinton was fully aware of the MEC's role in these proceedings. Dr. Brinton's knowledge of this fact, and his failure to thereafter object to this alleged violation of the Bylaws, in contravention of his contractual duty to do so, precludes Dr. Brinton from raising this objection on appeal. In addition, Dr. Brinton's argument is overly technical. The Hospital substantially complied with its obligations. Dr. Brinton was provided with notice of the charges against him and a full and fair hearing before an independent panel on March 20 and 21, 1991 (the "March 1991 Hearing Panel"). Whether that hearing took place as a result of the MEC's action or the Board's action was immaterial to IHC's contractual obligations. In addition, the hearing was advantageous to Dr. Brinton in the sense that it resulted in the Board's rescinding its proposal to revoke Dr. Brinton's privileges in favor of an extended term of probation. Even if Dr. Brinton did not waive this claim, the procedure actually employed by the Hospital fulfilled, as a matter of law, its contractual obligation to substantially comply with the fundamental purposes of its Bylaws.

### D. The Second Amended Terms of Probation

The March 1991 Hearing Panel found that, although there were still concerns about Dr. Brinton's practices, those concerns were not serious enough to merit revocation of his privileges. The panel recommended that Dr. Brinton's probation be continued for at least another year. The Board reviewed the panel's report, agreed that revocation was not warranted, and imposed the "Second Amended Terms of Probation."

On appeal, Dr. Brinton asserts that the Second Amended Terms of Probation were "illegally" imposed because (1) the Board voted to "accept" the March 1991 Hearing Panel's report and could not thereafter create new terms of probation at variance from the panel's recommendations without providing Dr. Brinton with notice of, and a hearing to review, the new terms; and (2) the Second Amended Terms of Probation were created by persons who did not have authority to create them, who did not consult the Board or obtain a formal vote to approve them, and who fraudulently concealed these facts, precluding Dr. Brinton from timely objecting.

The district court held that Dr. Brinton's claims with respect to the imposition of the Second Amended Terms of Probation were among the few that he had not waived. The issues regarding the Second Amended Terms of Probation therefore became a matter of construing IHC's contractual obligations. The court concluded that the record demonstrated IHC had met its obligations under

---

18. FHP § 2.20 states:

A recommendation or action listed in Section 2.10 shall be deemed adverse action only when it has been:
 a. Recommended by the Medical Executive Committee;
 b. Taken by the Board contrary to a favorable recommendation by the Medical Executive Committee under circumstances where no right to hearing existed; or
 c. Taken by the Board on its own initiative without benefit of a prior recommendation by the Medical Executive Committee.

FHP § 2.30 provided that, following an adverse action as defined in § 2.20, a practitioner shall be given notice of both the action and the practitioner's right to request a hearing on the proposed action.

19. IHC asserts that the MEC merely made a recommendation at the request of the Board, which did not constitute "adverse action" entitling Dr. Brinton to a separate hearing. Our review of the Bylaws and the FHP indicates that there is ambiguity in the definition of "adverse action," particularly in the context of this case, where the Hospital had essentially created special procedures to deal with Dr. Brinton's situation that evidently had not been anticipated by the drafters of the Bylaws and the FHP.

the Bylaws and that Dr. Brinton had been unable to raise any disputed issue of material fact demonstrating a lack of substantial compliance. The court consequently held that the Second Amended Terms of Probation were properly drafted and imposed.

The substance of Dr. Brinton's first allegation is that imposition of the Second Amended Terms of Probation constituted "adverse action," entitling Dr. Brinton to notice and a hearing under FHP §§ 2.10–2.30 and 3.30.[20] Specifically, Dr. Brinton argues that the Board's acceptance of the March 1991 Hearing Panel's recommendation in its entirety constituted a "favorable result" under FHP § 5.32(a). In adopting the panel's recommendation, the Board reversed its suspension of, and motion to revoke, Dr. Brinton's privileges in favor of continued probation. Under FHP § 5.32(a), a result favorable to the practitioner "shall become the final decision of the Board and the matter shall be considered closed." Imposing modified terms under the Second Amended Terms of Probation, argues Dr. Brinton, constituted new "adverse action."

■ We agree with the district court's conclusion that the Board's acceptance of the March 1991 Hearing Panel's recommendation did not constitute a "favorable" result, closing the matter. Although Dr. Brinton's privileges were not revoked and suspension of his privileges was lifted, the Board's decision to reinstate Dr. Brinton's privileges under strict probationary terms cannot be construed as a result sufficiently favorable to close the entire matter under FHP § 5.32(a). As noted by the district court, "the Board determined that the plaintiff should be kept on probation with terms limiting his practice, thus manifesting concern." Continued probation, by definition, left Dr. Brinton's performance subject to further scrutiny by the Board and other disciplinary bodies. The district court properly concluded that imposition of the Second Amended Terms of Proba-

tion did not constitute new adverse action entitling Dr. Brinton to notice and a hearing.

In addition, imposition of the Second Amended Terms of Probation is consistent with the Board's initial "acceptance" of the panel's recommendation that Dr. Brinton remain on probation for "at least" an additional year. Dr. Brinton points out that the terms of the Second Amended Terms of Probation differed from those of the Amended Terms of Probation, which the March 1991 Hearing Panel identified as "adequate." Apart from extending the probationary period and minor modifications to specific terms, the Second Amended Terms of Probation allowed for consideration of "not only new cases, but all previous cases involving violations of the terms of probation and standards of good medical practice commencing on January 1, 1987, and continuing to the present" in any subsequent corrective action or proposed professional review.

■ Dr. Brinton suggests that the Second Amended Terms of Probation could not vary from the recommendations of the March 1991 Hearing Panel's report. He implies that the Board, by formally "accepting" the panel's recommendation, forfeited the right to amend the terms of probation on any basis other than the explicit recommendations of the panel.

Dr. Brinton's assertion does not withstand scrutiny. It was not the panel's role to dictate specific amendments or clarifications to the terms of probation. The panel merely made generalized recommendations. In accepting the panel's recommendation, the Board simply conceded that its prior determination to revoke Dr. Brinton's privileges should be reversed in favor of continuing the probation. That vote cannot reasonably be construed as a choice by the Board to bind itself slavishly to every statement or infer-

---

20. Section 2.10, entitled "Recommendations or Actions," describes actions which may be deemed "adverse" under FHP § 2.20, as
 a. Denial of an application for initial appointment to the medical staff;
 b. Denial of staff reappointment;
 c. Reduction, suspension or revocation of staff membership;

 d. Reduction, suspension or revocation of clinical privileges;
 e. New requirement of consultation (as a device for monitoring patient care).
See *supra*, note 18, for a description of § 2.20. Section 3.30 entitles the practitioner, upon timely request, to a hearing by an independent committee following notice of specific adverse action.

ence that could be drawn from the panel's report.

Even if we take Dr. Brinton's argument at face value, a contextual view of the Board's actions following the March 1991 Hearing Panel's report shows only a technical error. The Board met several times and made several decisions shortly after the panel's recommendation. The product of these meetings probably should have been labeled a "modification" of the panel's recommendation rather than an "acceptance." Regardless of this technical variance from FHP procedures, Dr. Brinton was clearly informed of the Board's actual response to the panel's decision. Thus, the Board's decision to extend the probation for two years and to make certain relatively minor changes to the conditions of probation could not be construed as new adverse action entitling Dr. Brinton to a further round of hearings.

 With respect to Dr. Brinton's second allegation, that no properly authorized body approved the Second Amended Terms of Probation, the record does not support his assertion. Dr. Brinton contends that the Second Amended Terms of Probation were drafted or "manufactured" by unauthorized persons who concealed them from the Board, yet he cannot identify any provision of the terms that was not reviewed by the Board, and he cites no provision of the Bylaws preventing the Board from delegating the initial task of drafting the terms to other persons.

Following the March 1991 Hearing Panel report, the Hospital and Dr. Brinton commenced a series of discussions about revising the terms of probation. Proposed terms of probation were presented to Dr. Brinton in a letter dated April 17, 1991. The minutes of the June 19, 1991, Board meeting and the affidavit of Board member Larry Dursteler indicate specific changes that IHC and Dr. Brinton negotiated. The version of the Second Amended Terms of Probation that Dr. Brinton ultimately signed on August 6, 1991, reflects the changes attached to the June 19 Board minutes. Hence, the Board clearly reviewed a copy of the proposed terms sent to Dr. Brinton and then approved specific changes.[21] The copy Dr. Brinton signed[22] precisely reflects those changes with only minor additional modifications of certain calendar dates. Requiring the Board to actually go through the process of typing up the

21. Dr. Brinton places heavy reliance upon the minutes of the June 19, 1991, hearing. He asserts that those minutes somehow affirmatively reflect that the Board did not approve the Second Amended Terms of Probation. The minutes state the following with respect to the issue:

[Board Chairman] Merrill [Gappmayer] began a discussion regarding Dr. Brinton's appeal. He told the Board that the Executive Committee of the Board met with Dr. Brinton to go over each concern he had with regard to his amended terms of probation. Merrill distributed a letter from Dr. Brinton's attorney which outlined Dr. Brinton's concerns. The Board took time to read the letter and then began discussing each item. The results and decisions from that discussion are attached.

The minutes then provide a list of amendments that the Board approved at the meeting. The only reasonable inference that can be drawn from these minutes is that the Board had in its possession a copy of the proposed Second Amended Terms that had previously been sent to Dr. Brinton. Otherwise, the Board could not have discussed and approved any changes to those terms. Regardless of where the Second Amended Terms originated, the Board clearly had the opportunity to review them and approve changes. That there is no explicit reference to a formal vote on the terms is of no consequence.

The Board reviewed them, and at the very least provided a de facto endorsement of them, prior to the time when Dr. Brinton signed them.

22. Dr. Brinton again attempts to argue that he signed these terms under duress. In this instance, he alleges that, although he was not under the stress of summary suspension, he was threatened with suspension if he failed to sign the terms. This could not constitute duress because it was not an improper threat. *See Andreini*, 860 P.2d at 921.

The Hospital and Dr. Brinton's lawyer had discussed the Second Amended Terms for months before they were actually imposed, and Dr. Brinton had in the meantime pursued an appeal of the March 1991 Hearing Panel's report. In other words, Dr. Brinton and the Hospital had reached the end of the available administrative remedies, and they were now simply faced with the choice of adopting the Second Amended Terms of Probation or parting company. It is absurd for Dr. Brinton to argue that the Hospital could not use the threat of termination of his privileges to compel him to abide by terms that had been properly generated following a full and fair hearing. If the Hospital did not have the option of suspending Dr. Brinton for failure to comply with its decision, it never would have been able to enforce any of its decisions at all.

changes and then taking a redundant vote on the final document would have been an empty formality. We therefore agree with the district court that the Hospital substantially complied with the Bylaws when the Board received the March 1991 Hearing Panel's report and imposed the Second Amended Terms of Probation.

## E. Violation of the Second Amended Terms of Probation

In the summer of 1992, the Board again examined allegations that Dr. Brinton had provided substandard care. The Board voted to summarily suspend Dr. Brinton's privileges [23] and initiated proceedings to revoke his staff membership. Another hearing panel convened in October of 1992 (the "October 1992 Hearing Panel"). Under FHP § 4.60, Dr. Brinton had the burden of demonstrating that the Board's adverse action lacked "any factual basis" or was "arbitrary, unreasonable or capricious." [24] The Hospital presented earlier cases that had already been addressed by previous hearing panels. The Second Amended Terms of Probation specifically allowed the Hospital to do so. The Hospital argued that consideration of the earlier cases was necessary to provide the context in which the Board had proposed revocation of Dr. Brinton's privileges.

Dr. Brinton's allegations with respect to the October 1992 Hearing Panel are focused on provisions of the Second Amended Terms of Probation and the merits of the Hospital's case against him. He alleges that the Second Amended Terms of Probation violated the Bylaws by allowing for Board-initiated action, that the Board prevented him from obtaining necessary statistical data, and that the Board improperly presented allegations that had already been treated by prior hearing panels. We address these issues by examining whether, in construing the requirements of the Bylaws, the trial court correctly held that there were no disputed issues of material fact as to whether IHC substantially complied with its contractual obligations.

The Second Amended Terms of Probation provided for special scrutiny of Dr. Brinton's cases,[25] and a truncated procedure whereby the Board would determine and initiate adverse action against Dr. Brinton. Dr. Brinton's argument that the Second Amended Terms of Probation could not allow for Board-initiated adverse action fails because FHP § 2.20 explicitly addresses adverse actions "[t]aken by the Board on its own initiative without the benefit of a prior recommendation by the Medical Executive Committee." Therefore, as a matter of correct contractual interpretation, the procedure employed by the Hospital could not constitute a substantial variance from its obligations.

 Dr. Brinton also asserts that the Hospital refused to provide him with statistical data that was necessary to his defense before the October 1992 Hearing Panel. The argument on this issue is somewhat muddled. Neither Dr. Brinton nor IHC has provided

---

23. The Second Amended Terms of Probation specifically provided for "immediate automatic suspension" upon evidence of any violation. This provision may well have been related to the March 1991 Hearing Panel's report, which apparently construed the Hospital's *failure* to summarily suspend Dr. Brinton as a tacit admission that he posed no immediate and serious threat to his patients. Thus, in composing the Second Amended Terms, the Hospital was faced with the catch–22 that if it summarily suspended Dr. Brinton upon further allegations of substandard care, then Dr. Brinton might allege duress with respect to subsequent proceedings, but if it failed to summarily suspend him, it would lose credibility before an independent panel when it attempted to argue that Dr. Brinton was a threat to patient safety.

24. See *supra*, note 6.

25. Dr. Brinton complains about this scrutiny. The traditional quality assessment process addressed only those cases that "fell out" during a standardized screening process, whereas *all* of Dr. Brinton's cases were individually reviewed. The Second Amended Terms of Probation explicitly provided for examination of all of Dr. Brinton's cases. While the Bylaws do not explicitly provide for such a procedure, neither do they prohibit it. As a matter of common sense, the expanded screening of Dr. Brinton's cases was simply a consequence of the restrictions under which Dr. Brinton functioned. The concept of "probation" in any context implies heightened scrutiny. Dr. Brinton thus could not expect to be treated in precisely the same manner as other physicians who were not under probation. More importantly, the Hospital never asserted before the hearing panel or otherwise that Dr. Brinton should be held to a different *standard of care* than any other physicians.

record cites that sufficiently assist this Court in understanding the actual scope or nature of the statistical data requested.

Nevertheless, even if taken at face value, Dr. Brinton's assertion on this matter is unavailing because Dr. Brinton has not articulated sufficient prejudice to demonstrate a substantial variance from IHC's contractual obligations. The issue before the October 1992 Hearing Panel was whether Dr. Brinton had violated his probation, not whether generalized statistics showed favorable outcomes or low rates of complication in relation to other physicians. The Hospital's case for revocation of Dr. Brinton's privileges under the terms of probation was based upon its claim that Dr. Brinton had taken specific documented actions that created a risk of harm, even if that harm did not actually materialize. Hence, even if Dr. Brinton's allegation that the Hospital refused to provide him statistical data is true, there is no credible evidence that such data could have altered the panel's finding that specific cases constituted a violation of the Second Amended Terms of Probation. Because he has failed to demonstrate the prejudice necessary to maintain a claim that the Hospital did not substantially comply with its Bylaws, the trial court correctly rejected his argument on this issue.

With respect to Dr. Brinton's complaints about the Hospital's presentation of allega-tions previously addressed by other hearing panels, nothing in the Bylaws suggests the Hospital could not present Dr. Brinton's history so that the panel could gain an appreciation of that context. The Bylaws do not provide the equivalent of a "double jeopardy" rule. Where the Hospital was required to justify its decisions regarding staff privileges, those decisions could only be understood in the context of a complete history.[26]

 Moreover, the examination of Dr. Brinton's previous history was hardly a one-sided affair. Although the Hospital was allowed to more fully present Dr. Brinton's prior cases, Dr. Brinton had a concomitant opportunity to raise historical evidence about his peer review that was unfavorable to the Hospital.[27] Dr. Brinton was allowed to present the views of prior hearing panels that had been supportive of him in some respects. He was also able to present testimony from persons who believed the Hospital's actions were not justified. The October 1992 Hearing Panel weighed all this evidence and then rendered a recommendation supporting the revocation of Dr. Brinton's privileges. The district court correctly construed the Bylaws as permitting the presentation of prior cases.

*F. Treatment of the October Hearing Panel's Decision*

In a letter dated December 16, 1992, the Board subsequently notified Dr. Brinton of

---

**26.** In this regard, Dr. Brinton relies in part on the argument addressed above, that the Board's "acceptance" of the March 1991 Hearing Panel's recommendation constituted a "favorable" result, precluding subsequent review of the cases already scrutinized and "closed" pursuant to FHP § 5.32(a). This argument fails for two reasons. First, the Board's response to the panel cannot be construed as "favorable"; thus, cases and allegations subject to review prior to acceptance of the March 1991 Hearing Panel's recommendations were not "closed." Second, as discussed above, no provision of the FHP prohibits broad review of all relevant cases and allegations.

**27.** Dr. Brinton complains that the Hospital told its personnel not to speak with him, which hampered his ability to acquire favorable witnesses. If true, this is a somewhat troubling allegation. Although the Bylaws obviously do not envision discovery privileges equivalent to those applicable to formal judicial proceedings, any notion of fundamental fairness in administrative proceedings, even if contractually rather than constitu-tionally based, includes the principle of the opportunity to rebut and defend allegations of wrong-doing.

Nevertheless, Dr. Brinton has insufficiently developed this issue on appeal. Moreover, Dr. Brinton has not articulated what other significant or compelling evidence he would have been able to produce had he been granted freer reign to interview potential witnesses. He points only to one nurse who he claims would have testified that in her opinion he had not violated the standard of care. He was able to present similar testimony from another nurse at the October 1992 hearings, and it is unclear how duplicative testimony would have altered the outcome. He also presented far more compelling testimony from doctors who offered expert opinion that he had not violated the applicable standards of care, yet the October 1992 Hearing Panel was evidently unpersuaded by it. It is difficult to understand how a single nurse's testimony on the issue could have altered the outcome.

the October 1992 Hearing Panel's decision supporting the Board's earlier determination to terminate his privileges. Although FHP § 5.20 required the Board to formally affirm, modify, or reject the panel's findings, the Board simply forwarded notification of the results to Dr. Brinton and informed him that he had a right to appeal. Dr. Brinton argues that failure to hold a FHP § 5.20 hearing deprived him of a "documented report from which to appeal," making the appeal meaningless.

Before this Court, Dr. Brinton contests the conclusion of the district court that he waived this objection because he knew that no section 5.20 review occurred, yet he failed to object in subsequent proceedings before the Board. The district court based its conclusion upon several representations by Dr. Brinton that he did know of the lack of a section 5.20 Board review of the October 1992 Hearing Panel's findings. In his complaint, Dr. Brinton admitted that he learned of this omission upon receiving the December 16 letter. This conclusion is the clear implication of the language of that letter, and Dr. Brinton's counsel admitted as much before the district court. The letter quotes from the panel's conclusion, and informs Dr. Brinton of his right to appeal *that determination,* conspicuously omitting any language suggesting that the Board itself followed the panel with a section 5.20 review. Dr. Brinton also acknowledged under oath during a preliminary injunction proceeding that IHC never represented to him that it had conducted a section 5.20 review.

■■■ Only in his affidavit in support of his motion for summary judgment did Dr. Brinton change his position, claiming then that he did not know in time to object that a section 5.20 review had not occurred. Citing *Webster v. Sill,* 675 P.2d 1170 (Utah 1983), the district court correctly held that

> for purposes of the parties' motions for summary judgment, Dr. Brinton's affidavit, as a matter of law, cannot contradict his prior sworn statement and testimony,

which was clear and unequivocal, because the affidavit fails to state an adequate reason for the contradiction. As a result, the affidavit cannot create a genuine issue of fact that will preclude summary judgment. *See Webster,* 675 P.2d at 1172–73 (holding that an affidavit cannot contradict prior sworn testimony to create question of fact, unless contradiction adequately explained, because holding otherwise "would undermine the utility of summary judgment as a means for screening out sham issues of fact"). Dr. Brinton has failed to adequately explain this contradiction; therefore, the district court's determination that Dr. Brinton is precluded from raising this objection stands undisturbed.

Even if Dr. Brinton did not waive this claim, IHC still substantially complied with its fair hearing procedures. IHC concedes that the Board did not formally affirm the October 1992 Hearing Panel's recommendation. The hospital presumably assumed that a formal vote to affirm the panel's findings (which in turn affirmed the Board's earlier decision) would have been redundant. We agree. There would have been no logical basis for the Board to act in a manner contrary to its prior recommendation and the October 1992 Hearing Panel's report, particularly in light of Dr. Brinton's history and the Board's established pattern of substantial deference to hearing panel findings. Although the Board technically failed to comply with the Bylaws, it did substantially comply.

Moreover, the Board had an opportunity to review the panel's decision when Dr. Brinton appealed.[28] Thus, Dr. Brinton is unable to adduce how he was prejudiced by the Board's failure to formally affirm the panel's unambiguous recommendation. The district court found that, if anything, the Board's failure benefitted Dr. Brinton. Because the subsequent appellate review took place before the Board, Dr. Brinton actually had the opportunity to rebut the panel's recommendations *before* the Board formally affirmed it. It is difficult to understand how the Board

---

**28.** FHP § 5.33 provided in pertinent part:
If the result ... pursuant to Section 5.20 continues to be adverse to the practitioner in any of the respects listed in Section 2.10, the spe-

cial notice required by Section 5.31 shall inform the practitioner of his right to request an appellate review by the Board as provided in Section 6.10 of this plan.

would have been more likely to modify or reject the panel's recommendation prior to hearing Dr. Brinton's objections than after hearing them.

### G. Final Appellate Hearing

 Dr. Brinton also complains of alleged irregularities in the Board's convening of his final 1993 appellate hearing. Specifically, he complains that the appellate panel allowed three "unauthorized" persons to be present during the appellate panel's deliberations. The district court found that Dr. Brinton had not waived these objections and addressed them by construing IHC's actions as substantially complying with the Bylaws.

Section 7.70 of the FHP provides that appellate deliberations shall take place "outside the presence of the parties." The purportedly "unauthorized" persons present during deliberations were James Gilson, the Board's in-house counsel, Larry Dursteler, a hospital administrator, and Merlene Southwell, an IHC employee in charge of risk management. Hence, assuming these persons were "parties" for purposes of section 7.70, their presence would technically violate that section.

Determining whether these persons qualified as "parties" under the Bylaws is a complicated and difficult question. Adjudicating it would require an understanding of which persons had undertaken adversarial roles within the context of the Bylaws. Yet, Dr. Brinton has utterly failed to elucidate the nature of the roles played by the persons involved and has provided no argument beyond his conclusory assertions that they were not entitled to be there.

The district court found that, even if any of these people were "parties" for purposes of section 7.70, the Hospital had substantially complied with the Bylaws' provisions because Dr. Brinton had failed to meet his burden of demonstrating prejudice to create a material issue of disputed fact. The court held that (1) the presence of IHC's counsel had actually benefitted Dr. Brinton because that counsel could offer advice on compliance with the Bylaws for Dr. Brinton's benefit; (2) Dursteler was entitled to be present because he was a member of the Board; and (3) Southwell had merely acted as a courier to obtain documents and other materials during deliberations. Dr. Brinton has failed to materially rebut these rulings on appeal. We therefore uphold the district court's ruling that IHC substantially complied with its Bylaws in providing Dr. Brinton with appellate review.

### H. General Allegations of Bad Faith Conduct of Peer Review

 Finally, Dr. Brinton contends that IHC pursued a vindictive and unsubstantiated course of action against him that would constitute a violation of IHC's contractual obligation to pursue its peer review in good faith. Specifically, Dr. Brinton alleges that Dr. Romney, the Hospital's medical director, acted in bad faith, and he points to evidence in the record questioning the motivations of another prominent physician in the OB–GYN department, Dr. Stephen Clark. However, apart from fragmentary pieces of evidence showing that these two individuals were not entirely objective in their treatment of Dr. Brinton,[29] there is no specific evidence of bad

---

**29.** It is not surprising that disputes of this nature engender very intense emotions among persons placed in antagonistic postures. There is some evidence in the record that Dr. Romney had acquired a measure of hostility toward Dr. Brinton during the long course of the peer review proceedings. When Dr. Romney sought outside independent review of Dr. Brinton's cases, Dr. Dale Sundwall specifically expressed concern about the manner in which that review was solicited. Dr. Sundwall stated that Dr. Romney, prior to sending Dr. Brinton's charts, attempted to prejudice him against Dr. Brinton. A few other physicians noted that Dr. Romney had made comments to them that could have been interpreted as indicating an inappropriate bias

against Dr. Brinton. Dr. Thomas E. Myers submitted an affidavit in which he stated Dr. Romney had made hostile comments about Dr. Brinton and at the October 1992 hearing, Dr. DeVore recounted a similar conversation.

Dr. Romney also admitted that, owing to a perception of conflict, he had not forwarded a report by Dr. Heywood, the Hospital's initial independent physician. The March 1991 Hearing Panel criticized this action. Some members of the panel also expressed a belief that Dr. Clark had falsified a report concerning Dr. Brinton's consultation with him. Dr. Heywood himself expressed concern that there were "hidden agendas" behind the Hospital's attempts to revoke Dr.

faith actions by the Board or any of the hearing panels, who were the entities that ultimately decided his fate.

Dr. Brinton's allegations that the Hospital Board vigorously pursued its disciplinary actions against him in a vindictive and conspiratorial manner are not supported by any record evidence. In fact, the record indicates the contrary, showing that the Board was willing to recognize when Dr. Brinton was doing well and was meeting the terms of his probation. For instance, in April of 1990 the Board wrote Dr. Brinton a congratulatory letter, and the Board minutes of April 29, 1992, reflect that Dr. Romney delivered a favorable report about Dr. Brinton's progress.

Moreover, Dr. Brinton had the opportunity to present and explore the issue of bad faith bias on multiple occasions and specifically presented testimony from a number of people who directly questioned Dr. Romney's motives and the Board's actions. Yet the October 1992 Hearing Panel, though somewhat critical of Dr. Romney's occasional lack of objectivity,[30] explicitly found no evidence of a conspiracy or any unfair treatment of Dr. Brinton. That same panel chose to strongly endorse the Board's recommendation that Dr. Brinton's privileges be revoked.

Thus, although Dr. Brinton presented some evidence of bias on the part of certain individuals, he has presented no evidence of a wider conspiracy involving the administrative bodies that were actually responsible for Dr. Brinton's staff status. Hence, in this case, Dr. Brinton's disputed allegations of bad faith are not substantial enough to raise questions of material fact that would justify reversal of the district court's ruling on summary judgment.

## IV. CONCLUSION

Therefore, Dr. Brinton's claims either are meritless, were waived, or are not supported by articulable claims of prejudice derived from the Hospital's failure to substantially comply with the Bylaws. The district court

correctly granted summary judgment. We affirm.

Chief Justice HOWE, Justice ZIMMERMAN, Justice RUSSON and Judge WILKINS concur in Justice STEWART's opinion. Associate Chief Justice DURHAM, having disqualified herself, does not participate herein. Court of Appeals Judge MICHAEL J. WILKINS sat.

---

Brinton's privileges, although he was unable to articulate any specific reason for his perception.

**30.** The fact that the panel clearly recognized and accounted for Dr. Romney's potential bias actually lends credence to its own findings.