# IN THE COURT OF APPEALS OF TENNESSEE
## AT NASHVILLE
August 9, 2007 Session

## JAMES C. GEKAS, M.D. v. SETON CORPORATION, d/b/a BAPTIST HOSPITAL

**Appeal from the Chancery Court for Davidson County**
**No. 04-2185-IV     Richard Dinkins, Chancellor**

---

**No. M2006-00454-COA-R3-CV - Filed March 28, 2008**

---

The plaintiff physician sued the defendant hospital for breach of contract after the hospital declined to promote him to a permanent position on its medical staff. He claimed that the hospital's bylaws were part of his employment contract, and that the manner in which the hospital reached its decision violated those bylaws. The trial court granted summary judgment to the hospital. We agree that the bylaws formed part of his contract, but since the record clearly shows that the hospital substantially complied with its bylaws we affirm the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court**
**Affirmed**

PATRICIA J. COTTRELL, J., delivered the opinion of the court, in which E. RILEY ANDERSON, SP. J. joined. WILLIAM B. CAIN, P.J., M.S., not participating.

James C. Gekas, M.D., Nashville, Tennessee, Pro Se.

Charles J. Mataya; Karyn C. Bryant, Nashville, Tennessee, for the appellee, Seton Corporation d/b/a Baptist Hospital.

## OPINION

### I. HOSPITAL PROCEEDINGS

#### A. COMPLAINTS BY STAFF MEMBERS

Dr. James C. Gekas, graduated from medical school in 1970. After completing his residency, he became certified in internal medicine. He served in the United States Navy, and at various times he held medical licenses in six different states. At the time of the events discussed herein, he maintained active medical licenses in Tennessee and Georgia.

On October 8, 1997, Dr. Gekas joined the staff of Baptist Hospital in Nashville as a provisional staff member. Under the Medical Staff Bylaws of the hospital ("the Bylaws"), a provisional staff member "shall have all the prerogatives and shall perform all the responsibilities of the Active Staff," but is not considered a full member of the Medical Staff for certain purposes mostly related to governance of the Medical Staff and of the hospital's medical departments.

The Bylaws also provide that Practitioners who ultimately seek Active Staff Membership must serve on the Provisional Staff for a minimum of two years, but no longer than five years from the date of the initial appointment. The Bylaws state that "[f]ailure to advance to Active Staff within five (5) years of initial appointment shall result in termination of Medical Staff membership and privileges and shall entitle the practitioner to the hearing procedures set forth in Article VII of the Bylaws . . ."

In December of 2000, an emergency room nurse who was seven months pregnant filed a hand-written complaint against Dr. Gekas. She alleged that during an interaction with Dr. Gekas on Christmas Eve, he told her that she was slow and stupid, that she had only one brain cell, that "you must be from Blount County," and that she did not know the identity of her unborn child's father. According to the nurse, these insults were triggered when she handed him a different form to fill out than the one he had asked for. Dr. Gekas later said he was just joking. The hospital chose to take no action in regard to that complaint.

In February and March of 2001, Dr. Robert Hardin, Baptist Hospital's Chief Medical Officer, received additional written reports about the conduct of Dr. Gekas, prepared by several hospital nurses and a respiratory therapist who had each experienced difficult interactions with him. The reports described a pattern of rudeness and insults directed against the nurses, both within and outside the hearing of patients and of patients' families.

Ed Creamer, the Hospital's Director of Risk Management also prepared a memorandum about an incident in which Dr. Gekas phoned him and engaged him in a lengthy conversation to complain about numerous problems he was having with the entire staff at the hospital. According to Mr. Creamer, Dr. Gekas "was very rude throughout the conversation, using profanity." Mr. Creamer reported that the main complaint of Dr. Gekas was his belief that a nurse who was taking care of one of his patients might be taking the drugs intended for the patient. Mr. Creamer promised to look into the allegations but he could not substantiate them after investigation. According to Mr. Creamer's account, Dr. Gekas called him three weeks later to check on the status of his investigation. When he learned of Mr. Creamer's conclusion, he was very rude, cursed, and threatened to call the FBI or the TBI.

As a result of these reports, Dr. Gekas was asked to appear before the Internal Medicine Performance Improvement Subcommittee ("the Subcommittee") to address the staff's complaints. Such an appearance is in accordance with the "Informal Procedure" set out in Article VI of the Bylaws. At the meeting, Dr. Gekas gave his own account of the incidents in question, stating as to

one incident that he himself had been treated disrespectfully and had been provoked, as to another that he had been cordial rather than rude, and that he had no recollection of some of the others.[1]

At the conclusion of the hearing, the subcommittee members conferred among themselves. Their minutes summarize Dr. Gekas' account, but state that such complaints as were filed are quite rare, and that the incidents they described are "extremely detrimental to patient care and show poor interaction skills." Nonetheless, the subcommittee determined that no further action was needed, other than a follow-up letter to Dr. Gekas, to include information to enable him to pursue anger management.

The letter, signed by Subcommittee members Dr. Harrell Odom and Dr. Michael Niedermeyer stated among other things:

> This subcommittee will look very unfavorably upon any further complaints of this type from hospital personnel with regards to interaction with you in the future. Certainly, there are times when all of us are perceived differently than what we realize, but this episode with you and the Baptist staff stands out as being a particularly egregious example of this.

> The Committee would like you to consider obtaining assistance to improve your interpersonal skills and anger management. These confidential services are available through the Tennessee Medical Foundation Physician's Health Program. The number is 665-2516. Any further occurrences of inappropriate behavior at Baptist could result in disciplinary action.

Dr. Gekas chose not to avail himself of the services the Subcommittee referred to, because he decided they were unnecessary. On October of 2002, Dr. Hardin received a new report about Dr. Gekas, which involved an argument he had with Dr. Stephen Capizzi in a patient room. Dr. Capizzi was called in as a consulting pulmonologist for one of Dr. Gekas' patients. Dr. Capizzi alleged that Dr. Gekas shouted at him over the patient's bedside, told him that he didn't know what he was talking about, and that he was a liar. Nurses who had witnessed portions of the interaction between the two doctors also filed reports on the incident and its aftermath.

The Internal Medicine Performance Improvement Subcommittee met once again, and since the five-year limitation period on provisional staff members had just passed, they considered Dr. Gekas' request to be advanced to the Active Staff in addition to discussing Dr. Capizzi's complaint. In light of his history of difficult and inappropriate interactions with the healthcare team, the subcommittee recommended that Dr. Gekas not be advanced to the Active Staff category.

---

[1] The incident that was reported in December 2000 was apparently not discussed in the meeting, as Dr. Gekas claimed that he had no knowledge of that complaint until several years later, at which time he denied making the statements the nurse attributed to him.

Dr. Odom, who had by then become Chair of the Department of Internal Medicine, then asked the Internal Medicine Executive Committee to review the complaints against Dr. Gekas. He invited Dr. Gekas to a file a written report on his own version of the interaction between himself and Dr. Capizzi, but Dr. Gekas decided not to do so, because he thought it would "amplify the situation." The Internal Medicine Executive Committee recommended non-advancement. Dr. Odom concurred and advised the Medical Executive Committee, the next body up the decision-making ladder, of its decision.

On December 23, 2002, Dr. Hardin notified Dr. Gekas that the Medical Executive Committee had recommended that he not be advanced and advised him that he was entitled to request a hearing about this recommendation in accordance with Article VII of the bylaws. Dr. Gekas did request a hearing, and although more than five years had passed since his initial appointment, Dr. Hardin granted him full privileges for sixty or ninety days, or until the hearing occurred.

## B. THE HEARING UNDER ARTICLE VII OF THE BYLAWS

Three physicians were appointed to the Medical Executive Committee's "Ad Hoc Hearing Committee:" Dr. Anand, a nephrologist; Dr. Dalton, an anesthesiologist; and Dr. Smith, a neurosurgeon. Dr. Gekas and the hospital were both represented by attorneys. The hospital's attorney sent Dr. Gekas' attorney a letter which described the grounds the hospital had relied on to determine that Dr. Gekas should not be advanced and listed the witnesses who might be called upon to testify. Copies of the Performance Improvement Subcommittee's minutes and written statements by nurses and other hospital personnel were attached.

The first hearing day was May 22, 2003. The hospital called ten witnesses, most of them nurses, several of whom had worked at Baptist Hospital for over twenty years. Some were supervisors. Each testified only as to her own interactions with Dr. Gekas. In almost every case, the witness stated that she had not met or worked with Dr. Gekas prior to the incident she testified about, and that he had directed personal insults towards her or was rude in some way during that first encounter.

In one instance, Dr. Gekas allegedly referred to the nursing staff and respiratory therapy staff as rude and incompetent in front of a patient's family. In another, he asked a nurse in the presence of a patient and the patient's family whether she could count to ten without using her fingers. In yet another, Dr. Gekas asked the nurse on duty where one of his patients was, and the nurse pointed in the direction of the patient's room. Dr. Gekas allegedly became very angry because she pointed rather than speaking to him, and he complained to the nursing supervisor that the nurse must be prejudiced against him because he was Greek. The supervisor called in the offending nurse, who offered to apologize without quite understanding what she had done, but Dr. Gekas refused to accept her apology.

Dr. Capizzi and Ed Creamer also testified. Dr. Capizzi testified that his meeting in the hospital room of one of Dr. Gekas' patients was their first encounter. Dr. Capizzi had been called in as a consultant, and the two doctors found themselves leaning towards different diagnoses of the patient's underlying problem. According to Dr. Capizzi, Dr. Gekas dismissed all of his suggestions and recommendations, and accused him of not knowing medicine and of not examining the patient. When Dr. Capizzi explained that he had examined the patient before Dr. Gekas arrived, Dr. Gekas allegedly called him a liar. A nurse who was present testified that the patient, who had just been roused from sedation, started crying after Dr. Gekas shouted at Dr. Capizzi.

Dr. Gekas called two witnesses. The first was Dr. William Ralph, a partner in an internal medicine practice near Baptist Hospital which has used Dr. Gekas to cover weekend and night on-call duties. Dr. Ralph testified that he had no complaints about Dr. Gekas' work, and that no complaints about his interactions with staff or patients had surfaced in the four years that Dr. Gekas worked with the practice.

Dr. Gekas also called a nurse-practitioner who had worked with him for two years in a nursing home. She testified that he was very knowledgeable about nursing home medical problems, that he was kind and considerate, and that he always made himself available when needed. She further testified that she never knew him to be rude or to curse at a physician, a nurse or a patient. After her testimony, the hearing was adjourned until the following week.

May 29, 2003 was the second hearing day. Dr. Smith, the neurosurgeon, was unable to be present because he was needed in the operating room. Dr. Gekas' attorney did not object to the absence of Dr. Smith. Transcripts of both hearing days were prepared, and Dr. Smith read the transcript of the second day of testimony before signing the report and recommendation of the Committee to signify his concurrence.

Dr. Gekas called Dr. David McCord, who testified that he has known Dr. Gekas for six years, has a professional relationship with him, and has never known him to lose his temper or to treat a colleague discourteously. He also testified that he spoke to six nurses at the hospital, and that they uniformly told him that they knew him and weren't aware of any problems.

When Dr. Gekas was called to testify, he gave a very different account of the hospital room incident than Dr. Capizzi did. He asserted that he had spent many hours tending to the patient in the early hours of the morning and had then gone home after her condition stabilized. The hospital then called to tell him that her condition worsened, and he agreed to call in a pulmonology consultant. When he returned, Dr. Capizzi was already there, and had already written an order for IV Vasotec, an ACE inhibitor. Dr. Gekas then informed Dr. Capizzi that the patient was allergic to ACE inhibitors.

Dr. Capizzi allegedly replied, "I'm going to give it to her anyway." Dr. Gekas asserted that he found such a statement shocking, but that despite this alleged breach of medical protocol, he himself did not lose his temper, but remained cordial. He testified that he countermanded Dr.

Capizzi's order, but he denied that he had shouted or cursed. He claimed that he subsequently talked to other doctors about the incident, and that they said that under such conditions they would have physically thrown Dr. Capizzi out of the room, but that instead, "I didn't lower myself to that level. I thought it best to just turn my back on him and just let it cool down." He concluded, "Dr. Capizzi attacked me and I was victimized, not him."

Dr. Gekas was also asked about the ten witnesses who had testified as to inappropriate conduct on his part. He denied that he was guilty of any inappropriate conduct, claimed that all ten witnesses had misinformed the panel and that some of their testimony was "not true, absolutely a lie." He further claimed, "I can prove that in writing," asserting that inconsistencies in the written statements of the witnesses showed they weren't telling the truth.

At the conclusion of testimony, the attorneys for both parties delivered closing arguments. Since the bylaws provide a fifteen day period after the hearing for making a decision, and since Dr. Smith still had to read the transcript, no decision was made at that time. On July 3, 2003, Dr. Hardin sent Dr. Gekas a confidential memo of the Ad Hoc Committee, summarizing the proceedings in detail and concluding with a recommendation that Dr. Gekas not be advanced to the Active Staff. The Board of Seton Corporation, the hospital's parent company, subsequently reviewed the hearing record and written submissions by the parties, and determined that the Hearing Committee's recommendation was justified.

## II. JUDICIAL PROCEEDINGS

Dr. Gekas filed a complaint in the Chancery Court of Davidson County on July 27, 2004. He alleged that Baptist Hospital and Seton Corporation had breached their contract with him by failing to provide him with the fair hearing and due process provisions guaranteed by the Bylaws. He claimed the procedures were unfair, that the evidence against him was insufficient, and that the professional consequences of the hospital's decision were unduly harsh.

The hospital answered the complaint and subsequently moved the trial court for entry of summary judgment accompanied by a statement of undisputed facts and exhibits which included all the documents generated by the hospital proceedings, including a complete transcript of the two day hearing before the Ad Hoc Medical Executive Committee. Upon the request of Dr. Gekas, the trial court continued the scheduled hearing on the motion for summary judgment so Dr. Gekas could take "whatever discovery is necessary for him to respond to [the motion]." Dr. Gekas subsequently took the depositions of all the individuals who had filed complaints against him, as well as of Drs. Odom, Niedermeyer, and Hardin, and obtained copies of the confidential documents generated in the proceedings under the Bylaws. Those documents were also made part of the trial record.

The hearing on the defendant's motion was conducted on January 12, 2006. Both parties presented detailed arguments through their attorneys as to the procedures the hospital followed prior to its final decision not to advance Dr. Gekas to the Active Staff and as to whether or not those procedures were in substantial compliance with the requirements of the Bylaws. At the conclusion

of the hearing, the trial court announced that it was granting the hospital's motion for summary judgment. This appeal followed.

### III. ANALYSIS

### A. STANDARDS FOR SUMMARY JUDGMENT

The standards for awarding summary judgment are well known. Summary judgment may only be granted if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Tenn. R. Civ. P. 56.04; *Blair v. West Town Mall*, 130 S.W.3d 761, 764 (Tenn. 2004); *Pero's Steak & Spaghetti House v. Lee*, 90 S.W.3d 614, 620 (Tenn. 2002); *Byrd v. Hall*, 847 S.W.2d 208, 210 (Tenn. 1993). In determining whether there is a genuine issue of material fact, the trial court must view the pleadings and the evidence before it in the light most favorable to the opponent of the motion and allow all reasonable inferences in his favor. *Byrd v. Hall*, 847 S.W.2d at 215; *Taylor v. Banner Publishing Co.*, 573 S.W.2d 476 (Tenn. Ct. App. 1978)

On appeal, we review the summary judgment decision as a question of law. We accord no presumption of correctness to the trial court's decision, but review the record *de novo* and make a fresh determination of whether the requirements of Tenn. R. Civ. P. 56 have been met. *Eadie v. Complete Co., Inc.*, 142 S.W.3d 288, 291 (Tenn. 2004); *Blair v. West Town Mall*, 130 S.W.3d 761, 763 (Tenn. 2004); *Staples v. CBL & Assoc.*, 15 S.W.3d 83, 88 (Tenn. 2000); *Finister v. Humboldt Gen. Hosp., Inc.*, 970 S.W.2d 435, 437 (Tenn. 1998); *Robinson v. Omer*, 952 S.W.2d 423, 426 (Tenn. 1997).

### B. THE LEGAL SIGNIFICANCE OF HOSPITAL BYLAWS

For a long period of time, Tennessee courts held that private hospitals have the right to remove physicians from their medical staff for any reasons deemed sufficient by their managing authorities, and that such decisions did not give rise to a cause of action on the part of the excluded physician. *Nashville Memorial Hospital, Inc. v. Binkley,* 534 S.W.2d 318, 320 (Tenn. 1976). In 1991, our Supreme Court reexamined that holding, in light of new regulations requiring all licensed hospitals in the state to promulgate bylaws containing fair hearing procedures "concerning the granting, revocation, suspension, and removal of medical staff appointments, reappointments and/or delineation of privileges." *Lewisburg Community Hospital v. Alfredson,* 805 S.W.2d 756, 759 (Tenn. 1991) (citing *Tennessee Administrative Compilation*, § 1200-8-3-.02(2)(a)).

The court concluded that a hospital's bylaws have become, as a matter of law, an integral part of the contractual relationship between the hospital and the members of its medical staff. Thus, a member of the hospital staff has a contractual right to insist that the hospital follow its own bylaws. *Lewisburg Community Hospital*, 805 S.W.2d at 761. Dr. Gekas argues that in declining to advance him to its active staff, the defendant hospital breached its contract with him by failing to comply with the requirements of its bylaws. He also argues that there was an insufficient basis for the hospital's action and that it acted in an arbitrary and capricious manner.

This case presents a question of first impression: What is the proper standard to apply to breach of contract claims arising out of a hospital's personnel actions under its bylaws? Most jurisdictions that have considered this question follow the standard of substantial compliance: that is, if the hospital has substantially complied with the requirements of its bylaws, then it has met its contractual obligation.

> Utilizing breach of contract principles, most courts explicitly addressing the issue [of the standard of review in hospital bylaw cases] have held ...that the decision of a private hospital to revoke, suspend, restrict or to refuse to renew the staff appointment or clinical privileges of a medical staff member is subject to limited judicial review to ensure that there was substantial compliance with the hospital's medical staff bylaws governing such a decision, as well as to ensure that the medical staff bylaws afford basic notice and fair hearing procedures, including an impartial tribunal.

*Mahmoodian v. United Hospital Ctr., Inc.,* 404 S.E.2d 750, 755 (W.Va. 1991). *See also Brinton v. IHC Hospitals*, 973 P.2d 956, 964-965 (Utah 1999); *Owens v. New Britain General Hospital*, 643 A.2d 233, 239 (Conn. 1994); *Ray v. St. John's Health Care Corp.*, 582 N.E.2d 464, 469 (Ind. App. 1991). Under that standard, mere technical violations of procedures or policies will not give rise to a cause of action. *Brinton v. IHC Hospitals*, 973 P.2d at 965.

A Connecticut appeals court explained the reasoning behind the substantial compliance standard when it rejected a practitioner's argument that his right to practice medicine was a "fundamental right," and therefore that strict compliance with the bylaws was required before he could be deprived of his clinical privileges. *Owens v. New Britain General Hospital*, 627 A.2d at 1379, (affirmed by Connecticut Supreme Court in *Owens v. New Britain General Hospital*, 643 A.2d 233, 240 (Conn. 1994)).

The court stated that the purpose of the bylaws is to "provide, outside of the judicial system, a fair method for making decisions concerning staff privileges," *Owens v. New Britain General Hospital*, 627 A.2d at 1380 (*citing Nanavati v. Burdette Tomlin Memorial Hospital,* 526 A.2d 697 (N.J. 1987)), and that the purpose "is well-served by requiring substantial compliance with the terms of the bylaws." *Id.* Such a decision-making process is necessary to protect a physician against revocations of staff privileges "on the basis of unsupported accusations or on an arbitrary, unreasonable or capricious basis." *Id.* The court concluded that procedural fairness can be achieved so long as the hospital substantially follows the provisions in its bylaws in regard to "notice of charges, opportunity to respond, right to an impartial evidentiary hearing and other basic procedural protections." *Id* at 1379.

Courts that have considered the question have been careful to emphasize that their role is not to reweigh the evidence and substitute their own judgment for that of the hospital, but only to determine if the hospital has substantially complied with its bylaws and given the affected party adequate notice and the opportunity for a fair hearing before an impartial tribunal. *Brinton v. IHC*

*Hospitals*, 973 P.2d at 964; *Mahmoodian v. United Hospital Ctr., Inc.,* 404 S.E.2d at 756; *Owens v. New Britain General Hospital*, 627 A.2d at 1381; *Kennedy v. St. Joseph Memorial Hospital*, 482 N.E.2d 268, 270 (Ind. App. 1985). For the reasons stated by other courts adopting this standard, we believe that substantial compliance is the correct standard for Tennessee courts to follow as well.

### C. CLAIMS OF NON-COMPLIANCE WITH THE BYLAWS

Dr. Gekas has chosen to represent himself *pro se* in the present appeal. Although some of the arguments in his brief are difficult to understand, it is clear that he is claiming, among other things, that the hospital violated its bylaws in the proceedings at issue. To deal with those claims, we must briefly review the operative portions of the bylaws.

The complaints filed against Dr. Gekas in February and March of 2001 triggered the peer review provisions of Article VI of the Bylaws. That article is titled "Corrective Action" and is designed to deal with unprofessional or unethical activities by members of the professional staff as well as with adverse clinical events. The article sets out what it terms an "Informal Procedure" and a "Formal Procedure."

The Informal Procedure is described as a screening procedure which involves informal interview and discussion with the subject of the complaint, to determine whether the complaint is of sufficient significance to warrant further proceedings. None of the parties to the Informal Procedure are represented by legal counsel. If appropriate, "[n]o formal recommendation need be made and the matter may be dropped." If resolution under the Informal Procedure is inappropriate or unsuccessful, then the Formal Procedure comes into play. Under that procedure, the Medical Executive Committee or its designee may further investigate the matter and may recommend action to the Board ranging from dismissing the complaint to suspending or revoking Medical Staff membership and clinical privileges.

As we discussed above, complaints filed in February and March of 2001 against Dr. Gekas were handled by the Internal Medicine Performance Improvement Subcommittee under the Informal Procedure. Dr. Gekas had the opportunity to address the complaints and to explain his own perceptions of the events that led to them. At the conclusion of that procedure, the subcommittee decided not to take any formal action, but to write a letter to Dr. Gekas to inform him of an available resource to help him with interpersonal skills and anger management and to warn him of the consequences of any repetition of his inappropriate behavior.

As Dr. Gekas reached the end of the fifth year of his membership on the Provisional Staff, he became involved in an ugly altercation with another doctor. Such an incident could have been dealt with by corrective action under Article VI, and probably would have been if the incident had not coincided with the timetable for a decision on Dr. Gekas' appointment to the Active Staff. Since the Medical Executive Committee recommended against such an appointment, Dr. Gekas was entitled to ask for a full hearing under Article VII of the Bylaws, which he did.

Article VII sets out "hearing and appellate review procedures" where there has been an adverse recommendation by the Medical Executive Committee or the Hospital Board. The Article lists a recommendation that a Provisional Staff member not be advanced to the Active Staff as one kind of adverse recommendation which triggers a right to a due process hearing. Article VII, Section 1b(ii). At the Article VII hearing, the Medical Executive Committee heard testimony as to the complaints of December 2000, February and March of 2001, as well as the complaints of October of 2002.

On appeal, Dr. Gekas presents arguments as to all of those complaints, each to the effect that the hospital violated its own bylaws by considering them in the Article VII hearing. For example, he argues that the hospital should not have considered the October 2002 complaint of Dr. Capizzi because it was not first considered through the procedures set out in Article VI. However, we have read the relevant portions of the bylaws carefully, and we see nothing in Article VI which requires that every complaint against a practitioner be resolved through that Article's procedures. We note that the language of Article VI in regard to the initiation of corrective action is uniformly permissive rather than mandatory (e.g., "Corrective action <u>may</u> be requested,"..."A peer review process <u>may</u> be initiated..,"). Further, we see nothing in the procedures for "hearing and appellate review" set out in Article VII that limits its consideration to those incidents that have previously been the subject of proceedings under Article VI. Under Article VII, Section 6b, a hearing panel is entitled to consider "any relevant matter."

Finally, there is no connection between the Informal and Corrective Action procedures under Article VI and the hospital proceedings at issue. The advancement (or non-advancement) of a Provisional Staff Member to the Active Staff is governed by Article II, Section 5b(iii), which requires regular evaluation of provisional staff members, and a recommendation based on an appraisal of "the individual's overall performance." A practitioner who has received an adverse recommendation as to advancement is entitled "to the hearing procedures set forth in Article VII of the these Bylaws." This is exactly what transpired in the current case.

Article VII sets out in detail the notice requirements, structure and conduct of hearings under the Article, as well as the rights of the practitioner affected. These include representation by an attorney or other person of the practitioner's choice; to have a record made of the proceedings; to call, examine and cross-examine witnesses, to present evidence; and to submit a written statement at the close of the hearing. Article VII, Section 6(a). The practitioner may also appeal to the Board within 30 days of the receipt of an adverse decision. Article VII, Section 7. Dr. Gekas does not claim that he has been denied any of these rights.

Dr. Gekas also argues that the complaints arising from his behavior in February and March of 2001 were "fully resolved" in his favor at the hearing under the Informal Procedure, and that those complaints were accordingly "dropped." He concludes that any further consideration of those complaints should therefore have been prohibited. In so arguing, he badly mischaracterizes the import and conclusions of the Informal Procedure hearing. The Subcommittee did not find that the complaints against Dr. Gekas were groundless. The fact that it chose to warn him that "[a]ny further

occurrences of inappropriate behavior at Baptist could result in disciplinary action," rather than imposing immediate sanctions on him does not mean that the complaints were resolved in his favor.

It is difficult to reconcile the argument that the Ad Hoc Committee should not be allowed to consider the testimony of Dr. Capizzi because his complaint was not subject to an Article VI procedure, with the argument that the testimony of other complainants should also be excluded because their complaints were subject to such a procedure. The two arguments could be more easily reconciled if the Subcommittee had made some kind of explicit finding that the complaints against Dr. Gekas lacked any factual foundation, but no fair reading of the hearing minutes and the Subcommittee's letter supports even an implicit finding to that effect. Further, the bylaws do not contain the equivalent of a "double jeopardy" rule. *See Brinton v. IHC Hospitals*, 973 P.2d at 972.

Dr. Gekas also objects to any consideration of the barrage of insults he allegedly directed towards a pregnant hospital nurse on December 24, 2000. He claims that since the hospital chose to take no formal action in regard to that nurse's complaint, she should not have been allowed to testify before the Ad Hoc Committee, and her complaint should not have been made a part of the record. However, the Bylaws contain no requirement that would preclude witnesses with relevant information from testifying before the Committee, whether or not such information was previously documented or made the subject of disciplinary proceedings.

The record shows that on April 11, 2003, over a month before the hearing of the Ad Hoc Committee, Dr. Gekas was advised by letter of the names of every witness who might be called to testify. The written statements of all those potential witnesses, including the nurse in question, were included with the letter. He did not object to any of the witnesses testifying or to any of the witness statements. Thus, he can not claim that he did not have full notice of the identities of all the witnesses or of the substance of their expected testimony.

One possible deviation from the Bylaws which was not addressed in any detail by Dr. Gekas but merely alluded to concerns the role of Dr. Smith in the proceedings of the Ad Hoc Medical Executive Committee. Article VII, Section 6(g) states that ". . . if the hearing is held before an ad hoc hearing committee as described in this Article VII, Section 5(a)(ii), then all members of the ad hoc hearing committee must be present when the hearing takes place, and no members may vote by proxy." In the present case, all three members of the ad hoc committee were present for the first day of hearings, but Dr. Smith had to absent himself during the second day because of his clinical duties.

Dr. Gekas did not object to the absence of Dr. Smith or ask for a postponement of the testimony so a full panel could be present. A transcript of both days of proceedings was prepared, and Dr. Smith had the opportunity to read the second day's transcript before he voted. Therefore, even if there was technical non-compliance with the Bylaws, it was induced by the clinical demands of hospital life, all appropriate steps were taken to mitigate the effects of the non-compliance, and Dr. Gekas was given the opportunity to object, but chose not to.

In sum, it appears to us that the hospital gave adequate notice to Dr. Gekas of the pending proceedings under Article VII, that he was afforded all the rights provided for in the Bylaws, and that he had a full and fair hearing before his peers. Thus, the trial court did not err in finding that the hospital had substantially complied with the requirements of its Bylaws.

## D. THE BASIS FOR THE HOSPITAL'S DECISION

Dr. Gekas also argues that there was an insufficient basis for the hospital's decision. He notes that the allegations against him do not involve his medical knowledge or any complaints as to his competence as a physician. He states that in his thirty years of medical practice, he has only been sued once for malpractice, a case related to a mild scalp infection that was filed twenty years earlier and was resolved without any requirement of payment on his part. He further claims that in his dispute with Dr. Capizzi, his clinical judgment has been proven right and Dr. Capizzi's has been proven wrong.

The hospital insists that this court should not inquire into the sufficiency of the evidence, for that could lead us into substituting our judgment for that of the hospital, despite the fact that we are not endowed with the hospital's medical expertise. We agree that we must accord the utmost deference to a hospital's "good faith medical judgment." *Brinton v. IHC Hospitals*, 973 P.2d at 964. However, several of the cases we have cited suggest that a revocation of staff privileges, even if made in substantial compliance with the essential provisions of the bylaws can be set aside if it can be shown that the decision was arbitrary, capricious or unreasonable. *Owens v. New Britain General Hospital*, 627 A.2d at 1379; *Kennedy v. St. Joseph Memorial Hospital*, 482 N.E.2d at 271. We therefore believe we are entitled to examine the evidence, at least to the degree necessary to determine whether the hospital's decision was arbitrary, capricious or unreasonable.

Article I, Section 3 of the Medical Staff Bylaws, Rules and Regulations of Baptist Hospital states, *inter alia,* that "[m]embership on the Medical Staff or the exercise of clinical privileges is a privilege and not a right, extended by the Board to those Practitioners who initially and continually meet the standards set forth in these Bylaws and the Baptist Hospital Bylaws."

Article II, Section 3 of the Bylaws sets out a list of qualifications required of applicants for medical staff membership and clinical privileges. Predictably, the list includes requirements as to education, experience, training, licensing, competence, physical health and insurance coverage, but also the "demonstrated ability to work cooperatively with others in a hospital setting." Also, Article II, Section 4 sets out the conditions for appointment to the medical staff, reappointment and clinical privileges, including the following:

. . .

(xiv) To refrain from disruptive, unprofessional, indecent or abusive conduct or behavior which could adversely affect Hospital operations or the delivery of patient care.

. . .

      (xvi) To cooperate in a reasonable manner with other Practitioners, Hospital
      personnel and others in the Hospital

Further, Article II, Section 5(b)(iv)(c) states that in order to advance to the Active Staff, a Provisional Staff member must have demonstrated his willingness ". . . to cooperate with other medical and hospital personnel . . . ." The Bylaws make it apparent that in addition to its clinical requirements, Baptist Hospital regards a doctor's ability to interact well with other members of its staff as a matter of great importance. The hospital's decision not to advance Dr. Gekas to its active staff was not based upon any dissatisfaction with his clinical skills or knowledge, but rather upon the disruptive effect that his behavior had on staff and patients. Ten witnesses testified as to difficult and inappropriate encounters with Dr. Gekas, some of which occurred in the presence of hospital patients and their families. Much of the conduct testified to can easily be characterized as "disruptive, unprofessional, indecent or abusive," and inconsistent with the cooperation between staff members required for a hospital's proper functioning. The decision was based upon standards set out in the bylaws.

Aside from his assertions of clinical excellence, Dr. Gekas tries to refute the hospital's rationale by asserting that the testimony against him was simply false or that relatively minor incidents were blown way out of proportion because of some sort of bias against him. However, the hospital's Ad Hoc Committee saw the witnesses and heard them in person. A standard of substantial compliance with bylaws does not include a re-weighing of evidence by a reviewing court. We, therefore, cannot find that the hospital's decision was arbitrary, capricious or unreasonable, and we accordingly affirm the judgment of the trial court.

### IV. ATTORNEY FEES

Finally, the hospital asks us to award it the attorney fees it incurred on appeal, on the ground that the appeal was frivolous. A frivolous appeal is one that is "devoid of merit." *Combustion Engineering, Inc. v. Kennedy*, 562 S.W.2d 205 (Tenn. 1978), or one in which there is little prospect that it can ever succeed. *Robinson v. Currey* 153 S.W.3d 32, 42 (Tenn. Ct. App. 2004); *Industrial Dev. Bd. of the City of Tullahoma v. Hancock*, 901 S.W.2d 382, 385 (Tenn. Ct. App. 1995).

Tenn. Code Ann. § 27-1-122 authorizes our courts to award damages for appeals that are "frivolous or taken solely for delay." Such damages can include the attorney fees of the prevailing party. *Davis v. Gulf Insurance Group*, 546 S.W.2d 583, 586 (Tenn. 1977); *Bursack v. Wilson*, 982 S.W.2d 341, 345 (Tenn. Ct. App. 1998). Determining whether to award these damages is a matter within the discretion of the appeals court. *Banks v. St. Francis Hospital*, 697 S.W.2d 340, 343 (Tenn. 1985); *Glanton v. Lord,* 183 S.W.3d 391, 401 (Tenn. Ct. App. 2005). Insofar as this appeal required us to decide a question of first impression, *i.e.*, the proper standard for evaluating a hospital's compliance with its bylaws, we do not believe this appeal was frivolous, and we accordingly decline to award attorney fees.

**V.**

The judgment of the trial court is affirmed. We remand this case to the Chancery Court of Davidson County for any further proceedings necessary. Tax the costs on appeal to the appellant, Dr. James C. Gekas.

_____
PATRICIA J. COTTRELL, JUDGE